UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | | |
|---|---|---|
| CITY PARKWAY V, INC., et al., | ) | |
| | ) | |
| Plaintiffs/Counterdefendants, | ) | 2:09-CV-01299-PMP-GWF |
| | ) | |
| v. | ) | |
| | ) | |
| UNION PACIFIC RAILROAD | ) | |
| COMPANY, | ) | ORDER |
| | ) | |
| Defendant/Counterclaimant. | ) | |

Presently before the Court is Defendant Union Pacific Railroad Company's Motion for Partial Summary Judgment (Doc. #74), filed on September 19, 2011. Plaintiffs filed an Opposition (Doc. #84) on October 27, 2011. Defendant filed a Reply (Doc. #87) on November 14, 2011.

Also before the Court is Plaintiffs City Parkway IV A, Inc.; City Parkway V, Inc.; and Office District Parking I, Inc.'s Motion for Partial Summary Judgment (Doc. #77), filed on September 22, 2011. Defendant filed an Opposition (Doc. #85) on October 31, 2011. Plaintiffs filed a Reply (Doc. #88) on November 17, 2011.

Also before the Court is Defendant Union Pacific Railroad Company's Motion for Partial Summary Judgment (Doc. #86), filed on October 31, 2011. Plaintiffs filed an Opposition (Doc. #89) on November 28, 2011. Defendant filed a Reply (Doc. #90) on December 12, 2011.

The parties stipulated to staying the Court's consideration of these motions for nearly a year as the parties attempted to settle the matter. At the August 22, 2012 hearing,

1    the parties requested the Court set the motions for hearing.  (Mins. of Proceedings (Doc.

2    #101).)  The Court held a hearing on the motions on November 5, 2012.  (Mins. of

3    Proceedings (Doc. #102); Tr. (Doc. #103).)

4    **I. BACKGROUND**

5              Defendant Union Pacific Railroad Company ("Union Pacific") owned a 320 acre

6    tract of land located near downtown Las Vegas, Nevada (the "Property"), which Union

7    Pacific operated as a rail yard.  (Def.'s Opp'n to Pls.' Mot. Partial Summ. J. (Doc. #85)

8    ["Def.'s Opp'n"], Ex. A at 2.)  In May 1987, the Nevada Division of Environmental

9    Protection ("NDEP") issued a Finding of Alleged Violation and Order which found Union

10   Pacific violated Nevada environmental laws by unlawfully discharging pollutants on the

11   Property without a permit.  (Pls.' Mot. for Partial Summ. J. (Doc. #77) ["Pls.' MPSJ"], Ex.

12   3.)  Most relevant to this case, NDEP determined that Union Pacific had discharged

13   petroleum hydrocarbon contamination.  (Id.)  NDEP ordered Union Pacific to complete an

14   investigation into the extent of soil and water contamination and to submit to NDEP a site

15   map showing the locations of said contamination.  (Id.)  To determine total petroleum

16   hydrocarbon contamination ("TPH"), Union Pacific was to use EPA method 8015 modified

17   or EPA method 418.1.  (Id.)  Union Pacific also had to submit a recovery and mitigation

18   plan based on the results of its investigation.  (Id.)

19             Union Pacific thereafter conducted a site investigation and produced a Site

20   Characterization Report which identified various areas of contamination at the site, mostly

21   consisting of petroleum hydrocarbons, including Bunker C fuel.  (Pls.' Opp'n to Def.'s Mot.

22   Partial Summ. J. (Doc. #84) ["Pls.' Opp'n #1"], Ex. 10 at 4-1.)  Bunker C is "a heavier,

23   more viscus hydrocarbon sometimes referred to as diesel No. 6," and was used as train fuel

24   prior to diesel.  (Pls.' Opp'n #1, Ex. 9 at 21.)  Union Pacific used Bunker C until

25   approximately 1950, and it stored Bunker C in a tank on the Property.  (Id. at 22, 97.)

26   ///

1    Following its site investigation, Union Pacific proposed a remediation plan to

2  remove all visibly stained soil in the first 2.5 feet and to remove all visibly contaminated

3  soil below 2.5 feet encountered during any future development on the site. (Pls.' MPSJ, Ex.

4  4 at UPCH24.)  Despite the remediation of the first 2.5 feet of soil, "significant surface soil

5  contamination will remain, along with large volumes of high concentrations of TPH in the

6  soil below the 2.5 feet excavation zone." (Id.)

7    NDEP rejected this proposal.  Instead, in a September 1991 letter to Union

8  Pacific, NDEP required Union Pacific to:

9        - Remediate all soils with TPH values in excess of 100 mg/kg from
         ground level to 2 1/2 feet. . . .;
10       - remediate all soil with TPH values in excess of 10,000 mg/kg,
         irregardless of the depth, and;
11       - remediate all soil excavated during the remediation of soils greater
         than 10,000 mg/kg, to a TPH value of less than 100 mg/kg, and;
12       - provide as per the March 13, 1991 meeting, a guarantee to be
         approved by NDEP, that soils excavated during future construction
13       which have TPH levels in excess of 100 mg/kg (TPH) attributable to
         Union Pacific's past occupancy, will be disposed of by the railroad.

14

15  (Pls.' MPSJ, Ex. 6 (emphasis omitted).)  In an October 10, 1991 letter, Union Pacific

16  accepted NDEP's criteria. (Pls.' MPSJ, Ex. 7.)  With respect to the guarantee, Union

17  Pacific indicated it would "ensure that deed restrictions are placed on all affected parcels.

18  The deed restriction will require that all soils excavated in future development which are in

19  excess of 100 mg/kg will be disposed of properly in accordance with law, and Union Pacific

20  hereby guarantees that such disposal will be properly accomplished." (Id.)  Union Pacific

21  also "reaffirmed" that it was the responsible party for environmental contamination of soils

22  and water arising from its past activities at the Property. (Id.)

23    In June 1992, Union Pacific recommended a Remedial Action Plan for

24  contaminated soil and groundwater on the Property. (Def.'s Opp'n, Ex. A at 2, Ex. D.)

25  Pursuant to the Remedial Action Plan, Union Pacific would remove certain contaminated

26  soils from the Property, including soils contaminated with Bunker C. (Def.'s Opp'n, Ex. D

3

1   at ii, 2-4.)  Union Pacific also would treat on-site, using a mobile thermal treatment unit, the

2   top 2.5 feet of soil which tested above the action level identified by NDEP for TPH

3   contamination.  (See, e.g., id. at ii, 2-4–2-9, 4-1, 4-26.)  Thermally treated soil would be

4   returned to the site of excavation.  (Pls.' Opp'n #1, Ex. 9 at 116.)  Union Pacific proposed

5   use of EPA method 8015 modified to confirm NDEP action levels on TPH were achieved.

6   (Def.'s Opp'n, Ex. D at 4-1.)  Only certain areas of the Property were targeted for

7   remediation.  (Pls.' Opp'n #1, Ex. 12.)  On October 2, 1992, NDEP approved the proposed

8   Remedial Action Plan.  (Def.'s Opp'n, Ex. A at 2, Ex. E.)

9         During remediation, Union Pacific's testing at the Property indicated that its

10  thermal treatment was not fully treating heavy hydrocarbons, such as Bunker C, and Union

11  Pacific had to re-treat on some occasions.  (Pls.' Opp'n #1, Ex. 9 at 214, Ex. 16.)  As called

12  for in the Remedial Action Plan approved by NDEP, Union Pacific was using method 8015

13  modified to test for TPH concentrations.  (Pls.' Opp'n #1, Ex. 16.)  Union Pacific knew that

14  "[h]eavier petroleum hydrocarbons, such as Bunker C . . . are specifically not addressed in

15  the method."  (Id. at UPCH00386-87.)  Union Pacific noted some discrepancies in method

16  8015 modified, and Union Pacific was aware that some laboratories would increase the

17  range of hydrocarbons to be detected under the method to address the heavier hydrocarbons.

18  (Id. at UPCH00388-89.)

19        Union Pacific's contractor, USPCI, recommended reviewing samples, and if

20  "significant concentration of heavier hydrocarbons are being missed by Method

21  8015-Modified (Diesel), consider extending the method to C30," i.e., increasing the range

22  of hydrocarbons to test for so as to capture the presence of heavier hydrocarbons in the soil.

23  (Id. at UPCH003391.)  USPCI advised Union Pacific that "using the 8015-Modified

24  method, the concentration of these hydrocarbons are not being quantified or reported to the

25  State.  USPCI feels this issue should be discussed with the NDEP to insure that no

26  misunderstanding exists as to the cleanup criteria applied to the site."  (Pls.' Opp'n #1, Ex.

4

17 at UPCH003395.)  USPCI requested Union Pacific's input.  (Id. at UPCH003396.)

Union Pacific decided to continue to use method 8015 modified without extending the

hydrocarbon range, and without reporting the continued presence of heavier hydrocarbons

in the soil to NDEP.  (Pls.' Opp'n #1, Ex. 15, 17.)  Union Pacific completed remediation

under the Remedial Action Plan in 1994.  (Def.'s Opp'n, Ex. A at 2.)

On October 21, 1996, Union Pacific entered into a Purchase and Sale Agreement

("PSA") with PLY Stadium Partners, Inc. for the Property.  (Def.'s Mot. for Partial Summ.

J. (Doc. #74) ["Def.'s MPSJ #1"], Ex. A, Attach. A.)  Under Section 2.3(a)(iii) of the PSA,

part of the purchase price included Union Pacific's entitlement to reimbursement for

expenses related to future soil remediation under certain circumstances.  Specifically, Union

Pacific is entitled to "Excess Remediation Costs" for:

> (1) all soil excavated from the Property in order to construct
> subsurface parking for the general public or patrons of any
> sports/entertainment stadium, or other major entertainment complex of
> the nature of a Disney World, Universal Studios, Sea World, Church
> Street Station or MGM Grand, constructed on the Property (expressly
> excluding subsurface parking incident to the management and
> operation of the stadium or entertainment complex); and
> (2) all soil excavated more than 7 1/2 feet below the now
> current grade level of the Property within the "bowl" or area of the
> stadium on which sporting and other entertainment events will take
> place (the "Sports/Entertainment Area"), except to the extent NDEP
> (as defined in section 3.2(a)) or other governmental authorities having
> jurisdiction require excavation to continue below 7 1/2 feet by reason
> of contamination uncovered above that level; and
> (3) all soil excavated within that portion of the
> Sports/Entertainment Area (regardless of the depth or purpose of
> excavation) that is located within 500 feet of the current right-of-way
> of Bonneville Avenue, except to the extent NDEP or other
> governmental authorities having jurisdiction require excavation in such
> area by reason of contamination uncovered outside of such portion of
> the Sports/Entertainment Area.

(Id. at 4-5.)  According to the PSA, the "obligation to pay to [Union Pacific] the Excess

Remediation Costs shall run with the land . . . ."  (Id. at 6.)

Section 3.1 of the PSA provides that the Buyer had the opportunity to inspect the

Property and the Buyer accepted the Property "in an 'as is' condition with all faults, except

1   as otherwise provided in Section 3.2 below." (Id. at 7.)  Section 3.2 sets forth Union

2   Pacific's environmental obligations in relation to the Property.  (Id. at 8.)  Specifically,

3   Section 3.2 provides that Union Pacific--

> covenants and agrees to comply with the Plan with respect to the
> remediation of the Subject Contamination, as amended or modified
> pursuant to the terms, standards and acceptable levels of clean-up of
> the Subject Contamination as required by NDEP or agreed to by NDEP
> and [Union Pacific] in the future, including without limitation, any
> clean-up work, monitoring and recovery work and offsite work
> required by NDEP to be performed with respect to the Subject
> Contamination.

9   (Id.)  The PSA defines the Plan as the September 1991 letter in which NDEP set the target

10  levels for Union Pacific's remediation of the Property.  (Id.)  The Modified Plan means the

11  Plan of remediation "as amended or modified pursuant to the terms, standards and

12  acceptable levels of clean-up of the Subject Contamination as required by NDEP or agreed

13  to by NDEP and [Union Pacific] in the future, including without limitation, any clean-up

14  work, monitoring and recovery work and offsite work required by NDEP to be performed

15  with respect to the Subject Contamination."  (Id.)  The Subject Contamination means the

16  contamination identified in the March 1989 Site Characterization Report.  (Id.)

17          Additionally, the parties to the PSA acknowledged that some remediation of the

18  Property would not be required until excavation for development commenced, and Union

19  Pacific agreed to fulfill its environmental obligations during the course of the Buyer's

20  development operations and in coordination with the Buyer's development schedule to the

21  extent possible.  (Id. at 9-10.)  Union Pacific also agreed that it would dispose of soils

22  excavated during construction which have TPH contamination in excess of one hundred

23  (100) mg/kg "to the extent such contamination was present on the Property on the date of

24  Closing."  (Id.)  The Buyer in turn agreed that Union Pacific "shall not be required to

25  perform any excavation-related or other development activities which otherwise would be

26  performed in connection with the development of the Property in the absence of the

remediation requirements of the Plan or Modified Plan . . ., i.e., any activities which are not directly and solely attributable to the remediation of the Subject Contamination in accordance with the Plan or Modified Plan . . . ." (Id. at 9.)  In exchange, the Buyer released Union Pacific from any future claims related to the environmental condition of the Property "[e]xcept for [Union Pacific's] environmental obligations under Section 3.2." (Id. at 11.)

Upon consummation of the sale, Union Pacific deeded the Property to PLY Stadium Partners, Inc.'s assignee, Nevada Stadium Partners Limited Partnership. (Pls.' MPSJ, Ex. 9; Def.'s MPSJ #1, Ex. A, Attach. D.)  The deed contained environmental provisions by which Union Pacific gave notice that portions of the Property were affected by contaminated soil and groundwater. (Pls.' MPSJ, Ex. 9.)  The deed also contained certain environmental covenants:

> (b)  Grantor (for itself and its successors and assigns) hereby covenants and agrees, for the benefit of the Property and each successive owner of the Property or any portion thereof, that with respect to petroleum hydrocarbon contamination existing as of the date of this deed, Grantor shall (i) replace with clean soil and dispose of in accordance with law all soils on the Property excavated in the course of construction activity which contain total petroleum hydrocarbon levels in excess of one hundred (100) milligrams per kilogram, and (ii) remove and/or remediate in accordance with law any petroleum product in free or liquid phase that is present on or in the groundwater under the Property in an amount of excess of one-half inch (1/2") in depth.
>
> (c)  Grantor (for itself and its successors and assigns) hereby covenants and agrees for the benefit of the Property and each successive owner of the Property or any portion thereof, that with respect to heavy metals contamination existing as of the date of this deed, Grantor shall clean up, correct, or otherwise remediate all soils and waters located on or emanating from the Property from any contamination by heavy metals, including lead to a level of no more than 1400 milligrams per kilogram, to standards and in accordance with procedures now or in the future set by the governmental agency or agencies having jurisdiction over the establishment of such standards.

(Id.)  The parties also recorded a Memorandum of Rights which sets forth, among other things, Union Pacific's right to Excess Remediation Costs pursuant to Section 2.3(a)(iii) of

1    the PSA.  (Def.'s MPSJ #1, Ex. A, Attach. C.)

2            In 1997, Union Pacific requested from NDEP a final closure of soil obligations

3    on the Property.  (Def.'s Opp'n, Ex. A at 2.)  In March 1998, NDEP permitted Union

4    Pacific to conclude its remedial actions on the Property despite the presence of impacted

5    soil above limits specified in the Remedial Action Plan due to non-feasibility of treatment

6    and/or the limited potential for human contact with the impacted soil.  (Pls.' MPSJ, Ex. 8.)

7    NDEP issued a "no further action" letter indicating it would take no further action against

8    Union Pacific for remediation of the Property, subject to Union Pacific's obligations in

9    relation to future development activities at the Property.  (Id.)  NDEP thus would take no

10   enforcement action against Union Pacific for contamination at the Property if no further

11   excavation occurred on site, despite areas of contamination remaining on the Property.

12   (Def.'s Opp'n, Ex. I at 2; Pls.' Opp'n #1, Ex. 13.)

13           In 1998, the Property was foreclosed on and a trustee's deed was issued to PAMI

14   Las Vegas, Inc.  (Def.'s MPSJ #1, Ex. A, Attach. E.)  PAMI Las Vegas, Inc. thereafter sold

15   the Property to Plaintiff City Parkway V, Inc. ("City Parkway").[1]  (Def.'s MPSJ #1, Ex. A,

16   Attach. F.)

17           In 2006, City Parkway informed Union Pacific of planned excavation at the

18   Property, provided pre-excavation test results showing TPH impacted soil above Plan

19   levels, and provided an outline of how City Parkway intended to address the contamination.

20   (Pls.' Opp'n #1, Ex. 24 at 2-3, Ex. 25.)  In addition to the TPH impacted soils, debris and

21   soils with arsenic levels above regulatory goals were located.  (Pls.' Opp'n #1, Ex. 24 at 4,

22   Ex. 32.)

23   ///

24   _____

25           [1] City Parkway subdivided the Property and sold parcels to Plaintiff Office District Parking
     I and City Parkway IV A, Inc. (Notice of Removal (Doc. #1), Ex. A at 5.)  Because Plaintiffs' interests
26   are aligned, the Court will refer to Plaintiffs and City Parkway interchangeably.

1    In 2007, excavation began for the Lou Ruvo Brain Center ("Ruvo Center") on a

2 portion of the Property.  (Pls.' Opp'n #1, Ex. 24 at 2-3.)  In a June 2007 letter, City Parkway

3 notified Union Pacific of TPH and arsenic impacted soil, and requested Union Pacific fulfill

4 its environmental obligations under the deed.  (Pls.' Opp'n #1, Ex. 30.)  In the absence of a

5 response from Union Pacific, City Parkway stockpiled the contaminated soil at the site, and

6 incurred associated remedation, removal, sampling, testing, and stockpiling costs.  (Pls.'

7 Opp'n #1, Ex. 24 at 3.)

8    In 2007, City Parkway also excavated part of the Property in relation to the Bus

9 Rapid Transit Project ("BRT Project").  (Def.'s Mot. Partial Summ. J. (Doc. #86) ["Def.'s

10 MPSJ #2"], Decl. of Jim Levy at 2.)  Union Pacific paid in full for the handling and

11 disposal of all TPH impacted soil excavated in relation to the BRT Project.  (Id.)

12    Beginning in April 2008 and continuing through March 2009, City Parkway

13 excavated soil on the Property in connection with Phase I infrastructure projects, including

14 roadway and utilities construction, and temporary surface parking in relation to the Ruvo

15 Center and the Smith Center for Performing Arts ("Smith Center").  (Pls.' MPSJ, Ex. 10 at

16 2-3, Exs. 11-23.)  As part of these activities, City Parkway engaged in stockpile

17 management and testing of the excavated soil.  (Pls.' MPSJ, Ex. 10 at 2-3.)  Some of the

18 stockpiles contained soil which tested over 100 mg/kg of TPH contamination.  (Pls.' MPSJ,

19 Exs. 11-23.)  Union Pacific removed some of the contaminated stockpiles between May and

20 November 2008.  (Pls.' MPSJ, Ex. 10 at 3.)  Union Pacific incurred over $1 million in costs

21 in relation to Phase I contaminated soils removal.  (Def.'s MPSJ #2, Decl. of Jim Levy at

22 2.)  City Parkway did not pay for any of these costs.  (Id.)  However, Union Pacific refused

23 to remove remaining stockpiles despite City Parkway's request that Union Pacific do so.

24 (Pls.' MPSJ, Ex. 10 at 3.)

25    In May 2009, City Parkway and Union Pacific entered into a Soils Removal

26 Agreement to allow development of the Property to continue while the parties attempted to

resolve their disputes over which entity was responsible for what costs at the Property. (Pls.' MPSJ, Ex. 24.)  Pursuant to the Soils Removal Agreement, each side contributed $5 million to pay for costs to remove and remediate contaminated soils on the Property.  (Id.) Each party also agreed to be responsible for half the disposal costs incurred under the Soils Removal Agreement, regardless of which party incurred the costs.  (Id.)  However, the parties reserved their rights to be reimbursed for all of their costs incurred under the Soils Removal Agreement based on the parties' dispute over who should pay for removal of contaminated soils at the Property.  (Id.)

City Parkway thereafter removed and thermally treated the remaining contaminated stockpiles.  (Pls.' MPSJ, Ex. 10 at 3-4.)  City Parkway billed Union Pacific for one half the costs of removal and remediation for the Phase I contaminated soils, and Union Pacific paid its one half share in the amount of $449,433.36 pursuant to the Soils Removal Agreement.  (Pls.' MPSJ, Ex. 10 at 4, Ex. 25, Ex. 29; Def.'s Opp'n, Ex. J at 2.) However, City Parkway did not bill Union Pacific for over $500,000 related to stockpiling, testing, reporting, and Certified Environmental Manager ("CEM") oversight of the Phase I contaminated soils.  (Pls.' MPSJ, Ex. 10 at 4, Ex. 29.)

Union Pacific, for its part, incurred substantial soil handling costs under the Soils Removal Agreement.  (Def.'s MPSJ #2, Decl. of Jim Levy at 3.)  Union Pacific calculated the amount of soil remediated in relation to the BRT Project, Phase I infrastructure, and the Smith Center that Union Pacific handled for which Union Pacific would be entitled  to Excess Remediation Costs.  (Def.'s MPSJ #2, Ex. I.)  According to Union Pacific's calculations, Excess Remediation Costs amounted to $381,141 for the BRT Project, $740,224 for Phase I, and $1,274,388 for the Smith Center, for a total of $2,395,753 in Excess Remediation Costs.  (Id. at 4-5.)

The parties' disputes over costs in relation to the Property ultimately culminated in this litigation.  City Parkway brought suit in state court asserting claims for breach of the

10

deed covenants and breach of the duty of good faith and fair dealing. (Notice of Removal (Doc. #1), Ex. A.) Union Pacific removed the action to this Court and asserted counterclaims for breach of contract and breach of the covenant of good faith and fair dealing related to the deed, PSA, Memorandum of Rights, and Soils Removal Agreement. (Countercl. (Doc. #24).) Both parties also seek declaratory relief as to their respective rights and duties under the various agreements.

Union Pacific previously moved for summary judgment in this action, resulting in the Court making various findings of fact, including:

(1) The PSA (Exhibit A), the UPRC Deed (Exhibit B), and the Memorandum of Rights (Exhibit C) are the operative documents by which UPRC sold the Property in 1996.

. . .

(4) The UPRC Deed (Exhibit B), which was dated November 12, 1996, and recorded on November 18, 1996, transferred title to the Property from UPRC to Nevada Stadium Partners, and specifically incorporated the terms and conditions of the PSA.

. . .

(6) The PSA (Exhibit A), UPRC Deed (Exhibit B), Memorandum of Rights (Exhibit C), and Assignment (Exhibit D) establish the terms and conditions which apply to UPRC, PLY Stadium Partners, Nevada Stadium Partners, and all successive owners of the Property, including City Parkway V, Inc., City Parkway IV A, Inc., and Office District Parking I, Inc. (collectively referred to herein as the "City Parkway Parties").

(7) The terms and conditions of the UPRC sale of the Property evidenced by Exhibits A, B, C, and D are clear and unambiguous and may be construed, based on the clear meaning of the terms, by the Court as a matter of law.

(8) UPRC's environmental responsibilities for the Property are limited to the terms of the NDEP order of remediation, including those referenced in PSA.

(9) UPRC's "Environmental Obligations" set out in Article III, Section 3.2 of the PSA are covenants which run with the land and benefit all successive owners of the Property, including the City Parkway Parties.

(10) The right of UPRC to receive "Excess Remediation Costs" as described in Article II, Section 2.3(a)(iii) of the PSA is a covenant which runs with the land and obligates all successive owners of the Property, including the City Parkway Parties.

(11) The "Buyer's Release" as described in Article III, Section 3.3 of the PSA is a covenant which runs with the land and binds all successive owners of the Property, including the City Parkway Parties.

(12) Pursuant to the "Buyer's Release," UPRC has been

released from any environmental obligation not contained in the PSA, and/or beyond the scope of the NDEP order of remediation referenced in the PSA, and that release is binding on all successive owners of the Property, including the City Parkway Parties.

(13) The "As Is" provision set forth in Article III, Section 3.1 of the PSA is a covenant which runs with the land and binds all successive owners of the Property, including the City Parkway Parties.

(14) The City Parkway Parties knew of the relevant covenants before Plaintiff City Parkway V, Inc. ("City Parkway V") acquired the Property.

(15) The City Parkway Parties have acknowledged that the relevant covenants run with the Property.

(16) The City Parkway Parties, City Parkway V, Inc., City Parkway IV A, Inc., and Office District Parking I, Inc. are all successor owners of the Property (Lot 5).

(Order (Doc. #56).)  The Court also made similar conclusions of law regarding the unambiguous nature of the various documents, which covenants run with the land, that Union Pacific's environmental responsibilities for the Property are limited to the terms of the NDEP order of remediation, and that the City Parkway Parties are bound by the PSA, UPRC Deed, and Memorandum of Rights, including the obligation to pay Excess Remediation Costs.  (Id.)  The Court made the additional following legal conclusions:

(7) In determining the intent of the original parties to the sale of the Property with respect to UPRC's entitlement to Excess Remediation Costs, all of the transaction documents by which the Property was sold (i.e., Exhibits A, B, C, and D) must be viewed in their entirety.

(8) An examination of the transaction documents in their entirety, as opposed to focusing on one word or phrase, establishes that UPRC is entitled to Excess Remediation Costs for a broad range of potential development projects based on the areas of development, not the specific type of development.

(9) UPRC is entitled to Excess Remediation Costs under Article II, Section 2.3(a)(iii) of the PSA even if the development project is not a sports stadium where sports will be played.

(Id.)

Based on Plaintiffs' request to reconsider, the Court deleted its finding of fact in paragraph 15 that the City Parkway Parties acknowledged the relevant covenants run with the land.  (Order (Doc. #66).)  The Court also clarified that the NDEP order of remediation "refers to communications between UPRC and NDEP regarding a plan for remediation of

the Property.  Such communications include, but are not limited to, the letter dated September 10, 1991 from NDEP to UPRC."  (Id. at 6.)  The Court further clarified its prior Order by amending paragraphs 14 and 16 of the findings of fact as follows:

> (14) The City Parkway Parties had knowledge of and/or were on constructive notice of the covenants relating to the Property contained in the Purchase and Sale Agreement ("PSA"), the Grant, Bargain, and Sale Deed from UPRC to Nevada Stadium Partners Limited Partnership ("UPRC Deed"), and the Memorandum of Rights between UPRC and Nevada Stadium Partners Limited Partnership ("Memorandum") before Plaintiff City Parkway V, Inc. ("City Parkway V") acquired the Property.
> (16) The City Parkway Parties, City Parkway V, Inc., City Parkway IV A, Inc., and Office District Parking I, Inc. are all successor owners of the Property.

(Id.)  The Court altered paragraphs 7 through 9 of the conclusions of law as follows:

> (7) In determining the intent of the original parties to the sale of the Property with respect to UPRC's entitlement to Excess Remediation Costs, all of the transaction documents by which the Property was sold must be viewed in their entirety.
> (8) An examination of the transaction documents and specifically Article II, Section 2.3(a)(iii) of the PSA establishes that UPRC is entitled to Excess Remediation Costs for a broad range of potential development projects based on the areas and/or locations of the Property to be developed as well as the uses of such development (i.e. subsurface parking for the general public) in accordance with those areas, locations, and uses listed in Article II, Section 2.3(a)(iii) of the PSA.
> (9) References to developments mentioned in Article II, Section 2.3(a)(iii) of the PSA serve only as examples of the type of development projects for which UPRC would be entitled to Excess Remediation Costs and are not meant to be an exhaustive list of development projects for which UPRC is entitled to Excess Remediation Costs.

(Id. at 6-7.)  Finally, the Court clarified that "whether the proposed development of the Property falls within the categories for which UPRC is entitled to Excess Remediation Costs has not been decided by this Court."  (Id. at 7.)

The parties are now before the Court on cross motions for summary judgment.  In its first motion for partial summary judgment (Doc. #74), Union Pacific argues there is no evidence it breached its environmental obligations by failing to remediate soils associated

1   with the Ruvo Center, there is no evidence Union Pacific failed to remediate TPH impacted

2   soil prior to closing on the sale of the Property, and there is no evidence Union Pacific's

3   environmental obligations include handling arsenic or heavier hydrocarbons such as Bunker

4   C.  Union Pacific thus argues it is entitled to summary judgment on City Parkway's claims

5   against it on these bases.  In its second motion (Doc. #86), Union Pacific moves for

6   recovery of Excess Remediation Costs for the BRT Project and Phase I.  In Plaintiffs'

7   motion for partial summary judgment (Doc. #77), Plaintiffs argue Union Pacific is liable for

8   costs associated with Phase I infrastructure remediation which Union Pacific has refused to

9   pay, and that these costs are not Excess Remediation Costs.

10  **II.  LEGAL STANDARDS**

11          Summary judgment is appropriate if the pleadings, the discovery and disclosure

12  materials on file, and any affidavits show that "there is no genuine dispute as to any

13  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

14  56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the

15  governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An

16  issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find

17  for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th

18  Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue

19  of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the

20  moving party meets its burden, the burden shifts to the non-moving party to produce

21  evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all

22  evidence in the light most favorable to the non-moving party.  Id.

23          Under Nevada law, when the facts are not in dispute, contract interpretation is a

24  question of law.  Lehrer McGovern Bovis, Inc. v. Bullock Insulation, Inc., 197 P.3d 1032,

25  1041 (Nev. 2008).  The Court construes unambiguous contracts according to their plain

26  language.  Sheehan & Sheehan v. Nelson Malley & Co., 117 P.3d 219, 223-24 (Nev. 2005).

A contract is ambiguous if it is subject to more than one reasonable interpretation.  <u>Anvui, LLC v. G.L. Dragon, LLC</u>, 163 P.3d 405, 407 (Nev. 2007).  When interpreting a contract, "the court shall effectuate the intent of the parties, which may be determined in light of the surrounding circumstances if not clear from the contract itself."  <u>Sheehan</u>, 117 P.3d at 224 (quotation omitted).  "The parties' intentions regarding a contractual provision present a question of fact."  <u>Anvui, LLC</u>, 163 P.3d at 407.

**III.  UNION PACIFIC'S FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. #74)**

In Union Pacific's first Motion for Partial Summary Judgment, Union Pacific moves for summary judgment on City Parkway's claims to the extent those claims are based on Union Pacific failing to remove and/or remediate soil and debris from the Ruvo Center site and failing to fully remediate TPH impacted soil before the Property was sold. Additionally, Union Pacific moves for summary judgment on City Parkway's claims to the extent they are based on Union Pacific failing to remove and/or remediate soils and debris impacted by arsenic or heavy petroleum hydrocarbons such as Bunker C.  Plaintiffs oppose.

**A.  Pleading**

Union Pacific argues Plaintiffs cannot pursue a claim that Union Pacific failed to fulfill its environmental obligations by not removing debris from the Ruvo Center site because Plaintiffs did not allege this in the Complaint.  Paragraphs 39-40 of the Complaint allege that Union Pacific failed to respond to City Parkway's demands with respect to the Ruvo Center remediation effort, City Parkway incurred costs to dispose of contaminated soil and obtain clean replacement fill, and Union Pacific failed to reimburse City Parkway for these costs.  The Complaint alleges Union Pacific has failed to fulfill its environmental obligations with respect to impacted soils and groundwater.  Under notice pleading, City Parkway did not need to specify in the Complaint that Union Pacific failed to remediate the Property at the time of sale, nor did City Parkway need to identify every contaminant for

impacted soils, such as arsenic.  Fed. R. Civ. P. 8(a).  However, the Complaint does not

allege Union Pacific failed to fulfill its environmental obligations with respect to hazardous

waste debris, and contains no factual allegations related to hazardous waste debris.  The

Court therefore will grant Union Pacific's Motion on this basis to the extent it relates to

debris removal.  See Ideal Elec. Co. v. Flowserve Corp., 357 F. Supp. 2d 1248, 1253 (D.

Nev. 2005); Fed. R. Civ. P. 8(a).

**B.  TPH Impacted Soil**

Union Pacific contends City Parkway cannot show that any soil was TPH

impacted due to Union Pacific's past use of the Property.  Union Pacific also argues City

Parkway cannot show that the costs incurred by City Parkway do not include costs for

handling non-TPH impacted soil for which Union Pacific has no responsibility, and do not

include costs for consultants or other costs outside the actual costs of handling the impacted

soil.  Finally, Union Pacific argues City Parkway cannot show the costs incurred were

reasonable and necessary.

City Parkway responds that NDEP allowed Union Pacific to close its remediation

program even though significant contamination remained on the Property, subject to Union

Pacific's future environmental obligations should development of the Property result in

excavation of impacted soils.  City Parkway thus contends Union Pacific has environmental

obligations to remediate any soil that is TPH impacted above 100 mg/kg excavated during

future construction.  City Parkway argues it has presented evidence that it uncovered TPH

impacted soil during excavation at the Ruvo Center, that it incurred costs because Union

Pacific did not fulfill its environmental obligations, and Union Pacific has refused to

reimburse City Parkway for these expenses.

1.  Bunker C from Past Use by Union Pacific

Viewing the evidence in the light most favorable to City Parkway, genuine issues

of fact remain.  City Parkway has presented evidence raising issues of fact as to whether

TPH impacted soil resulted from Union Pacific's past use of the Property.  Union Pacific's site characterization report identified numerous areas of petroleum hydrocarbon contamination, including Bunker C contamination.  Union Pacific obtained NDEP's permission to conclude environmental remediation without removing or remediating all contamination on the Property, subject to future obligations.  Consequently, City Parkway has presented evidence that TPH contamination existed on the Property at the time of sale.

Additionally, City Parkway has presented evidence that Union Pacific's thermal treatment of the soil did not remove heavier hydrocarbons such as Bunker C from treated soil.  As Union Pacific's internal documents show, when Union Pacific was remediating the Property, Union Pacific was aware that its thermal treatment likely was leaving heavier hydrocarbons in the soil, but Union Pacific chose not to increase the treatment temperature.  Additionally, City Parkway presents evidence that the pattern of TPH contamination in the soil is consistent with thermal treatment which eradicated petroleum hydrocarbons in the lower and mid range, but not heavier hydrocarbons such as Bunker C.  City Parkway also presents evidence that none of its activities would have caused or contributed to the TPH contamination on the Property.

### 2.  Union Pacific's Obligations Regarding Bunker C

In its Reply, Union Pacific contends that NDEP chose method 8015 modified, which does not test for heavier hydrocarbons, and thus Union Pacific had no remediation obligation for heavier hydrocarbons such as Bunker C.  However, Union Pacific's environmental obligations refer to total petroleum hydrocarbons, not just certain hydrocarbons.  The Remedial Action Plan contemplated Bunker C remediation.  Moreover, Union Pacific's internal documents from the time note that some laboratories would increase the range on method 8015 modified to capture higher range hydrocarbons.  Union Pacific could have clarified with NDEP its obligations as USPCI suggested, but Union Pacific chose not to.  Thus, viewing the evidence in the light most favorable to City

1   Parkway, issues of fact remain as to whether Union Pacific had an obligation to remediate

2   Bunker C.

3                           3.  Objection to Goebel Report

4           Union Pacific argues in its Reply that the report of Plaintiffs' expert, Kurt Goebel

5   ("Goebel"), is inadmissible hearsay because it is based on a reported finding of soil in the

6   area that exceeded the TPH level and not based on Goebel's own on-site investigation.  An

7   expert may rely on hearsay or other inadmissible evidence so long as his opinion is based on

8   facts or data upon which experts in the field reasonably rely.  Fed. R. Evid. 703.  Union

9   Pacific does not suggest or explain why it would be unreasonable for Goebel to rely on the

10  soil testing done by City Parkway's contractor or based on a review of site-related

11  documents at NDEP.  Union Pacific does not, and so far as the record reveals never has,

12  challenged the actual results of any of the soil testing which showed TPH levels exceeding

13  100 mg/kg in some of the excavated soil.  Union Pacific does not point to a Rule of

14  Evidence or case law requires an expert to personally conduct all testing upon which he

15  bases his opinion.  Consequently, the Court will overrule Union Pacific's objection to

16  Goebel's report.

17                          4.  Actually Incurred Costs

18          As to whether City Parkway actually incurred remediation costs, City Parkway

19  includes an affidavit from Scott Carter ("Carter"), who works for the Economic and Urban

20  Development Department.  Carter avers to costs City Parkway incurred for "importing and

21  replacing tph and arsenic contaminated soil with clean fill" and "disposing of the tph

22  impacted soil."  (Pls.' Opp'n #1, Ex. 24 at 4.)  Viewing this evidence in the light most

23  favorable to City Parkway, City Parkway has incurred costs for remediation and removal of

24  TPH impacted soils.  Whether those costs also include other non-allowable costs or

25  unreasonably or unnecessarily high costs may affect the amount of a final judgment, but at

26  this stage of the proceedings, City Parkway has presented evidence raising an issue of fact

that it incurred costs related to removal of TPH impacted soils.  The Court therefore will
deny this portion of Union Pacific's motion.

5.  Union Pacific's Financial Obligations

In its Reply, Union Pacific argues that City Parkway ignores the "as is," buyer's
release, and Excess Remediation Costs provisions of the PSA, which Union Pacific
contends shifted financial responsibility for future remediation from Union Pacific to future
developers.  Union Pacific argues it did not guarantee to NDEP that it would do the
remediation work itself, just that it would guarantee that the work was done properly under
the law, and Union Pacific therefore could transfer financial responsibility for remediation
to the buyer of the Property.

The PSA unambiguously provides that both the "as is" and buyer's release
clauses are subject to section 3.2 of the PSA, which contains Union Pacific's environmental
obligations.  Under Section 3.2, Union Pacific covenants and agrees to comply with the
Plan with respect to the remediation of the Subject Contamination pursuant to the terms,
standards, and acceptable levels of clean-up required by NDEP.  Under the Plan, Union
Pacific bore responsibility for remediation in relation to future development.  Thus, as
between NDEP and Union Pacific, Union Pacific agreed it would remain the responsible
party for future cleanup.  As between Union Pacific and the subsequent owners of the
Property, the deed by which Union Pacific transferred the Property covenants that Union
Pacific would be responsible for future remediation.  Additionally, under the PSA, Excess
Remediation Costs are a subset of remediation costs, and the Buyer would reimburse Union
Pacific for Excess Remediation Costs only under specified circumstances.  Consequently,
any other applicable remediation costs were to be born by Union Pacific, as the subsequent
owner was liable to Union Pacific only for Excess Remediation Costs.  To the extent Union
Pacific or City Parkway incurred remediation costs that are not Excess Remediation Costs,
Union Pacific is the financially responsible party under the Plan, the deed, and the PSA.

19

1

2
6.  Sale of the Ruvo Site

3
In its Reply, Union Pacific argues there is no evidence City Parkway incurred

4
costs because development of the Ruvo site occurred after City Parkway sold that portion of

5
the Property to Keep Memory Alive.  Union Pacific cites no evidence to support this

6
argument.  Additionally, Union Pacific raises this argument for the first time in reply, and it

7
is not an arguably fair response to the issues raised in City Parkway's Opposition.

8
Carstarphen v. Milsner, 594 F. Supp. 2d 1201, 1204 n.1 (D. Nev. 2009).  The Court

9
therefore will not consider it.  In any event, City Parkway presented an affidavit that it

incurred these costs, and Union Pacific presents no contrary evidence.

**C.  Arsenic**

Union Pacific argues City Parkway did not plead that Union Pacific breached its

environmental obligations by failing to remediate and/or remove arsenic impacted soils, and

City Parkway there should not be able to pursue relief based on remediation of arsenic

impacted soils.  Union Pacific further contends City Parkway cannot show Union Pacific

was required to handle soil impacted by arsenic.  Union Pacific also argues City Parkway

will be unable to show arsenic levels exceeded normal background levels for the Las Vegas

area.  Finally, Union Pacific argues City Parkway cannot show the arsenic resulted from

Union Pacific's activities on the Property.

City Parkway responds that it pled arsenic contamination because arsenic is

included within the category of contaminants Union Pacific was required to handle under

the NDEP order of remediation and deed covenants, which required Union Pacific to

remediate any heavy metal that exceeded the regulatory standard.  City Parkway contends it

has presented evidence that it encountered arsenic impacted soils above the then-applicable

regulatory guideline.  City Parkway argues that because Union Pacific did not respond to

City Parkway's request to handle the soils, Union Pacific cannot now contend that City

Parkway should have handled the arsenic soils differently, or at least there is a genuine

issue of fact as to whether City Parkway acted appropriately.

The deed covenant states that "with respect to heavy metals contamination existing as of the date of this deed," Union Pacific shall remediate "all soils and waters located on or emanating from the Property from any contamination by heavy metals . . . to standards and in accordance with procedures now or in the future set by the governmental agency or agencies having jurisdiction over the establishment of such standards."  However, the PSA unambiguously limits Union Pacific's financial responsibility for environmental obligations to the "Subject Contamination," which the PSA defines as the contamination documented in the Site Characterization Report.  City Parkway does not point to any evidence in the record that arsenic was identified as a contaminant in the Site Characterization Report, or that NDEP set any remediation level for arsenic on the Property.  Given the "as is" and buyer's release provisions, and the lack of arsenic as part of the "Subject Contamination" as defined in the PSA, City Parkway has failed to present evidence raising an issue of fact that arsenic falls within Union Pacific's environmental obligations under the PSA.  The Court therefore will grant the Union Pacific's Motion to the extent it relates to Union Pacific's environmental obligations to remediate arsenic impacted soils.

### D.  Conclusion

The Court will grant in part and deny in part Union Pacific's first Motion for Partial Summary Judgment.  The Court will grant the Motion to the extent City Parkway's claims are based on debris or arsenic remediation.  The Court will deny the Motion in all other respects.

### IV.  UNION PACIFIC'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. #86)/PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. #77)

Union Pacific's second Motion for Partial Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment both revolve around the issue of what constitutes

Excess Remediation Costs.  In its Motion, Union Pacific argues the Court's prior Orders establish its right to collect Excess Remediation Costs related to the BRT Project, Phase I infrastructure, and the Smith Center.  Union Pacific argues the projects are within the broad range of potential development projects identified in the PSA and were essential to development of the BRT Project and the Smith Center.

Plaintiffs respond that Union Pacific is responsible for TPH impacted soil, some of the soil excavated for each of these projects was TPH impacted, and Union Pacific therefore cannot charge for Excess Remediation Costs for those soils.  Additionally, Plaintiffs argue that Excess Remediation Costs are contractually limited to soils excavated for subsurface parking or excavated from the area on which sports or other entertainment will take place.  Plaintiffs contend the BRT Project and Phase I infrastructure do not meet these criteria, and only a small portion of the Smith Center would fit this criteria.

Additionally, Plaintiffs contend that Union Pacific's expert, Ted Petranoff ("Petranoff"), calculated Excess Remediation Costs in a manner that is inconsistent with Union Pacific's other positions in this case.  Plaintiffs argue Petranoff claims City Parkway added two feet of soil to the Property, yet Petranoff calculated Union Pacific's liability from 0 to 7.5 feet, instead of from 2 feet to 9.5 feet.  Plaintiffs also dispute that Union Pacific fully treated the soil, and thus Petranoff improperly includes within the Excess Remediation Costs soils which Union Pacific is obligated to remediate.  Plaintiffs further contend Union Pacific is improperly charging Plaintiffs for Petranoff's time.

In Plaintiffs' Motion, Plaintiffs contend they paid for Phase I infrastructure soil remediation and removal that is Union Pacific's responsibility because it was over 100 mg/kg TPH contaminated, and Union Pacific has failed to pay.  Specifically, Plaintiffs contend that although Union Pacific removed some contaminated Phase I soil, Union Pacific did not remove all of it, and Plaintiffs therefore incurred costs for removal, stockpiling, stockpile maintenance, and CEM oversight for these TPH contaminated soils.

1   Although City Parkway billed Union Pacific for half of these costs under the Soils Removal

2   Agreement, which Union Pacific paid, City Parkway contends Union Pacific is liable for the

3   other half of the costs as well, as the soils were entirely Union Pacific's responsibility.  City

4   Parkway contends these costs are not Excess Remediation Costs because the work was done

5   for roadways, utility trenches, and temporary surface parking.

6           Union Pacific responds that its environmental obligations are set forth in the

7   NDEP order and the PSA, and City Parkway fails to acknowledge its own environmental

8   obligations for the Property.  Specifically, Union Pacific contends that the "as is," buyer's

9   release, and development costs clauses limit Union Pacific's financial obligations.  Union

10  Pacific further contends that City Parkway is not entitled to reimbursement for stockpiling,

11  testing, reporting, and CEM oversight, because the PSA transferred the financial

12  responsibility for handling TPH impacted soils to the developer.  Union Pacific further

13  argues no document requires Union Pacific to pay for stockpiling, stockpile management,

14  testing, reporting, or CEM oversight.  Union Pacific also contends the costs incurred were

15  Excess Remediation Costs for which Union Pacific would be entitled to payment because

16  the roadways and utilities were essential to any project on the Property.[2]

17          In the Court's first Order on summary judgment, the Court held that the

18  transaction documents must be read together, and "[a]n examination of the transaction

19  documents in their entirety, as opposed to focusing on one word or phrase, establishes that

20  [Union Pacific] is entitled to Excess Remediation Costs for a broad range of potential

21  development projects based on the areas of development, not the specific type of

22

23          [2]  Union Pacific contends Plaintiffs did not plead a claim for these costs in the Complaint.
    However, in the Complaint, City Parkway alleges Union Pacific is liable for "any and all Disposal
24  Costs paid for by Plaintiffs pursuant to the Soils Removal Agreement." (Compl. at ¶ 41.)  Plaintiffs
    also alleged that due to Union Pacific's breach, Plaintiffs had to stockpile and dispose of the soil.  (Id.
25  at ¶¶ 42, 47.)  The Soils Removal Agreement provides that the parties agreed to share in the costs for
    Disposal Costs, which included costs incurred in characterizing and stockpiling soils. (Pls.' MPSJ, Ex.
26  24 at UPR0001777.)

1   development." (Order (Doc. #56) at 6.) Further, the Court held that Union Pacific is

2   entitled to Excess Remediation Costs "even if the development project is not a sports

3   stadium where sports will be played." (Id.)

4          In the Court's second Order, the Court clarified that "[a]n examination of the

5   transaction documents . . . establishes that [Union Pacific] is entitled to Excess Remediation

6   Costs for a broad range of potential development projects based on the areas and/or

7   locations of the Property to be developed as well as the uses of such development (i.e.

8   subsurface parking for the general public) in accordance with those areas, locations, and

9   uses listed in Article II, Section 2.3(a)(iii) of the PSA." (Order (Doc. #66) at 6.)

10  Additionally, the Court stated that "[r]eferences to developments mentioned in Article II,

11  Section 2.3(a)(iii) of the PSA serve only as examples of the type of development projects

12  for which [Union Pacific] would be entitled to Excess Remediation Costs and are not meant

13  to be an exhaustive list of development projects for which [Union Pacific] is entitled to

14  Excess Remediation Costs." (Id.) Finally, the Court clarified that "whether the proposed

15  development of the Property falls within the categories for which [Union Pacific] is entitled

16  to Excess Remediation Costs has not been decided by this Court." (Id.) The parties' cross-

17  motions now seek to have the Court decide whether the BRT Project, the Phase I

18  infrastructure, and the Smith Center fall within the categories which entitle Union Pacific to

19  Excess Remediation Costs under the PSA.

20         The parties to the PSA unambiguously agreed that for TPH impacted soils

21  uncovered during future development, Union Pacific would bear financial responsibility for

22  soil remediation for the top 7 1/2 feet of soil. But if the new owner got overly adventurous

23  in its development, for example by excavating a large, deep area of the Property for the

24  bowl of a sports stadium or some other entertainment complex such as an aquarium for a

25  Sea World type park, or an underground parking garage for customers of a stadium or an

26  amusement park, then Union Pacific would not bear financial responsibility for remediating

such a large volume of potentially contaminated soils.  This is set forth in the PSA's Excess Remediation Costs provision, which transfers from Union Pacific to the new owner financial responsibility for soil remediation below 7 1/2 feet for such extensive projects.

The Court's prior Orders indicated that the parties to the PSA contemplated a broad range of projects for which Union Pacific would be entitled to Excess Remediation Costs.  That does not mean, however, that Union Pacific is entitled to Excess Remediation Costs for any development on the Property.  The fact that Article X of the PSA contemplates other types of development weighs against interpreting the Excess Remediation Costs provision too broadly.  In the face of knowing the Property could be developed in a number of different ways, the parties specifically limited Union Pacific's right to Excess Remediation Costs to three particularly enumerated and described categories.  An expansion of the covered categories to virtually any development of the Property would not hew to the contractual language, and would leave the Court and the parties without a manageable standard for determining what falls within the Excess Remediation Costs provision.  Moreover, had the parties intended the provision to have such a broad scope, they could and would have said so.

Likewise, Union Pacific's proposed interpretation that anything "essential to" development on the Property qualifies as Excess Remediation Costs is not tied to any contractual language.  If the parties to the PSA had intended Union Pacific to be entitled to Excess Remediation Costs for any remediation done for work "essential to" development on the Property, they could and would have said so.

As to the clause in the PSA which states that Union Pacific is not responsible for any excavation expenses for development of the Property, the clause at issue states that Union Pacific shall not be required to perform any excavation or development activities which would be performed in connection with the development of the Property even in the absence of the Plan's remediation requirements.  There is no evidence that City Parkway is

1   charging for any excavation costs.  Rather, because Union Pacific would not remove or

2   remediate the soil, City Parkway incurred consequential damages of having to stockpile,

3   maintain, test, report, and engage in environmental oversight over the soils.  Section 3.2(f)

4   of the PSA provides that if Union Pacific fails to fulfill its environmental obligations, the

5   new owner would be entitled to "all reasonable testing, removal, clean-up, disposal and

6   remediation costs or expenses."  (Def.'s MPSJ #1, Ex. A, Attach. A at 10-11.)

7            With these principles in mind, even viewing the facts in the light most favorable

8   to Union Pacific on City Parkway's Motion, no genuine issue of fact remains that the BRT

9   Project and Phase I infrastructure do not fall within any of the areas, locations, or uses set

10  forth in Section 2.3(a)(iii) of the PSA.  The BRT Project involved widening a street to allow

11  for construction of a dedicated lane of traffic for bus travel.  (Pls.' Opp'n #2, Ex. 7 at 3.)

12  While the street was removed, oversized utilities were installed to provide future services

13  for neighboring projects such as Symphony Park and the World Market Center.  (Id.)  The

14  Phase I infrastructure likewise involved roadways, utility trenches, and some temporary

15  surface parking.  (Id.)  Union Pacific's only evidence on the point is the conclusory

16  statement of its expert, Petranoff, that the BRT Project and Phase I infrastructure fall within

17  the areas, locations, or uses set forth in the PSA.  However, Petranoff does not tie his

18  conclusion to any particular area, location, or use in the contractual language of Section

19  2.3(a)(iii).  Soils excavated for roads, utility trenches, and temporary surface parking do not

20  fall within Section 2.3(a)(iii)(1) because they do not involve subsurface parking for the

21  general public for a sports stadium or other major entertainment complex.  They do not fall

22  within Section 2.3(a)(iii)(2) or (3) because there is no evidence the roads, utility trenches, or

23  temporary surface parking were below 7 1/2 feet and within the bowl or area of the stadium

24  or other entertainment complex on which sporting or other entertainment events will take

25  place.

26  ///

1    The Smith Center project, however, is an entertainment complex at which

2    entertainment events are performed.  The Smith Center project thus fits within the range of

3    areas, locations, and uses of Section 2.3(a)(iii)(2) for which Union Pacific is entitled to

4    Excess Remediation Costs.  City Parkway seeks to limit Excess Remediation Costs to 8.2%

5    of the Smith Center's footprint because only the orchestra pit and the theater stage are areas

6    where entertainment events are performed.  City Parkway's proposed interpretation of the

7    PSA is too narrow.  Sports and entertainment events "take place" not just on the playing

8    surface or the stage where the performance occurs, but also where the audience perceives

9    the events and, at times, interacts with the performance and becomes part of the events

10   taking place.  Thus, the bowl or area of a stadium on which sporting and other events take

11   place includes not only the playing surface, but the stands from which the audience views

12   the sporting or entertainment event, cheers, boos, and otherwise takes part in the

13   performance.  Similarly, entertainment events at a theater such as the Smith Center "take

14   place" not only on the stage and orchestra pit, but the area of the theater in which the

15   audience views the performance and interacts with the performers, such as by applauding,

16   laughing, crying, singing along, or calling for an encore.  The audience is part of the sport

17   or entertainment event taking place, and the area of the stadium or entertainment complex

18   on which sports or entertainment takes place therefore must include the area where the

19   audience views it.

20          However, genuine issues of fact remain as to the amount of remediation and

21   removal costs Union Pacific owes to City Parkway, and the amount of Excess Remediation

22   Costs that City Parkway owes to Union Pacific.  Viewing the facts in the light most

23   favorable to City Parkway on Union Pacific's Motion, genuine issues of fact remain as to

24   Petranoff's Excess Remediation Costs calculation.  Although Petranoff denies his

25   calculation charges City Parkway for the top 2 feet of soil, Petranoff's calculations state in

26   more than one place that "City of Las Vegas holds responsibility for the top 2 feet of the

1   excavation, UPRR holds responsibility for the excavation between 2 feet and 7.5 feet."

2   (See Def.'s MPSJ #2, Ex. G at UPR0004522, UPCH001862.)  A reasonable jury thus could

3   find Petranoff improperly added the top 2 feet in his calculation of City Parkway's liability

4   for Excess Remediation Costs because issues of fact remain as to whether City Parkway

5   added any fill to the Property.  Additionally, a reasonable jury could conclude that although

6   Petranoff assumed 2 feet of fill, Petranoff did not extend Union Pacific's liability to 9.5 feet

7   to account for the fill because he terminates Union Pacific's liability at 7.5 feet.  On the

8   other hand, viewing the facts in the light most favorable to Union Pacific on City Parkway's

9   Motion, a reasonable jury could accept Petranoff's criticisms of City Parkway's calculation

10  of the amount of costs incurred for remediation and removal of soils, and a reasonable jury

11  could accept Petranoff's method as the proper means to determine the amount of Excess

12  Remediation Costs.  The Court therefore will grant in part and deny in part the parties'

13  cross-motions regarding Excess Remediation Costs.

14  **V. CONCLUSION**

15          IT IS THEREFORE ORDERED that Defendant Union Pacific Railroad

16  Company's Motion for Partial Summary Judgment (Doc. #74) is hereby GRANTED in part

17  and DENIED in part.  The Motion is granted with respect to Plaintiffs' claims to the extent

18  they are based on removal of debris and arsenic impacted soil.  The Motion is denied in all

19  other respects.

20          IT IS FURTHER ORDERED that Plaintiffs City Parkway IV A, Inc.; City

21  Parkway V, Inc.; and Office District Parking I, Inc.'s Motion for Partial Summary Judgment

22  (Doc. #77) is hereby GRANTED in part and DENIED in part.  The Motion is granted to the

23  extent that Plaintiffs are entitled to recover for soil remediation and removal costs in

24  relation to the BRT Project, the Phase I infrastructure, and the Smith Center, less Excess

25  Remediation Costs for those portions of the Smith Center encompassing the stage, orchestra

26  pit, and audience viewing area.

1         IT IS FURTHER ORDERED that Defendant Union Pacific Railroad Company's

2    Motion for Partial Summary Judgment (Doc. #86) is hereby GRANTED in part and

3    DENIED in part.  The Motion is granted to the extent that Defendant Union Pacific

4    Railroad Company is entitled to Excess Remediation Costs for those portions of the Smith

5    Center encompassing the stage, orchestra pit, and audience viewing area.  The Motion is

6    denied in all other respects.

7

8    DATED:  December 3, 2012

9    _____

10   PHILIP M. PRO
     United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26